## Nunley v. Commonwealth.
### (Decided Feb. 22, 1938.)

·WAUGH & HOWERTON for appellant.

HUBERT MEREDITH, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming.

The appellant, Paul Nunley, has been convicted of the crime of manslaughter and sentenced to four years' imprisonment in the state penitentiary. He seeks a reversal of the judgment on two grounds: (1) All the evidence tends to show that the killing was in self-defense, and the court therefore erred in overruling his motion for a directed verdict of acquittal; and (2) the verdict is flagrantly against the evidence.

The appellant killed Millard Valentine by striking him on the head with an empty beer bottle. The killing occurred at a gasoline filling station in Westwood, a suburb of Ashland, Ky. The filling station was owned by Paul Kazakas, who operated it in connection with a restaurant and soft drink stand known as the "Hickory Pit Grill." On the evening of the homicide, Tommy Greer, who operated the filling station for the owner, and Nunley entered the restaurant and sat down at a table with Henry Brown, Burris Pennington, and Charles Mitchell. Shortly thereafter Valentine entered the restaurant and sat down by the side of Nunley. It appears that he and Nunley were acquaintances and friends, and there is no evidence that they had ever had any difficulty. They began chaffing each other and continued the banter back and forth, apparently in a good-natured manner, until Nunley made a remark about Valentine's wife at which Valentine became offended. Burris Pennington, who was sitting at the table with Nunley and Valentine, testified as follows concerning the argument:

"Well, I was in the Hickory Pit Grill, in the booth, in the same booth with Brown, on the same side of the booth and Nunley came in and sat on the opposite side when he came up and Nunley came and then Valentine came over and you could tell he had been drinking and he told Nunley to skoot over and he sat down by him and Tommy Greer, he was also on the same side of the table with Henry Brown and I, and Tom drank his beer and then went out.

"Q. Tommy Greer went out? A. Yes sir, I think he went to his filling station, I would not say. I can't just say how the argument got started. They started talking, I didn't pay so much attention what was going on.

"Q. Until the talk got louder? A. Until it got loud and Nunley was talking about Valentine's wife. That is, I think, when they began talking loud. When Nunley began talking about Valentine's wife.

"Q. You say Nunley was talking about Valentine's wife, what did he say? A. Well, Nunley just said he had been visiting Valentine's wife while he was away at work. Valentine told him that he didn't care what he said about him, or about his looks. That he could 'kid' him all he wanted but to leave his wife out of it. He said to leave her name out of it and that he didn't want anything said about that and when he said that Nunley repeated it several times and Valentine told him that he didn't like it and finally they got pretty strong—got to arguing pretty heavy and Valentine objected and Nunley says well, if that is the way you feel about it I will leave and Valentine says, well, I don't like it, and Nunley says, well, then if that is the way you feel about it, I will leave you, and he got up and walked out."

Henry Brown and Charles Mitchell, who were also at the table, testified to the same effect. Soon after the argument ended, Valentine entered the filling station where appellant, Tommy Greer, Dorothy Porter, and Evelyn Ray were drinking beer and listening to the radio. The argument was renewed, and ended when Nunley struck Valentine with the beer bottle. Concerning what occurred at the filling station, Dorothy Porter testified as follows:

"A. Then Valentine came in where we was and he was drinking and he saw Paul and all of us in there, and he and Paul got to arguing about each others hair and Valentine got mad and threw beer on Paul and Tommy tried to get him to go home and he took ahold of him and led him out and told him to go home and Valentine came back and he picked up a brick and just walked over to the other side of the building.

"Q. Just who was over there? A. Just Tom and Tom hit him with his fist, didn't knock him down and Paul went and tried to separate them and he couldn't so he walked then up to the filling station and got a beer bottle and he says, I will have to settle this right now, and he hit Valentine over the head with it, and when he hit him he fell. I saw the beer bottle in his hand.

"Q. Where did Paul get the beer bottle? A. I don't know, I was watching Tom and Valentine and he said to Evelyn and I,—He says, I will have to settle this right now and he walked straight up to Valentine and Tommy was there out some two or three feet from him and finally Paul got to Valentine and he hit him, struck him over his left temple with the beer bottle but didn't break the beer bottle and Valentine fell, fell down and Tom told Evelyn and I to go to the grill."

Evelyn Ray testified as follows concerning the conduct of the parties, just before and at the time the fatal blow was struck:

"Valentine starts down towards the garage and picks up a brick and chases Tommy with it and Tommy run over on the other side of the station to keep from getting hit and then they come back down by the tank and Tommy tries to make up with him, telling him that he is his friend, and that he wanted him to go on home. He says, you are all on me, you are yellow so Paul came out and he tried to separate them and he started to fussing with Paul, still had the brick in his hand and Paul backed off from him, off to the window and reached through the window and onto the shelf and got a beer bottle but he had it behind him and he walked out and stepped up on the concrete—

"Q. How was Paul holding the bottle when he stepped up on the concrete? A. He was holding it behind him and Valentine asked what he had behind him and Paul didn't make any answer. He asked him that two or three times and the last time Valentine asked him he hit him over the head."

Newt Nickols was standing about 180 feet from the filling station and saw the deceased, Greer, and Paul Nunley scuffling. He testified:

"Paul just all at once started and dashes into the filling station and he comes out with a bottle behind him and comes up to where they were and Paul stepped up on that concrete. * * * Something like about half a minute and then he hit Valentine and Valentine fell and I never seen a man hit a beef any harder than he hit that man with the beer bottle and he fell."

The appellant testified that he struck the deceased when the latter was threatening to strike him with a brick, and at the time he believed he was in danger of great bodily harm or death at the hands of the deceased. Tommy Greer corroborated appellant.

There was evidence from which the jury might reasonably infer that appellant acted hastily and at a time when he had no reasonable grounds to believe that he was in immediate danger of bodily harm at the hands of the deceased, and also that he used greater force than was reasonably necessary to repel the assault upon him even if such an assault was being made. According to one or more of the witnesses, he concealed the beer bottle behind his back and struck the deceased when the latter asked him what he had in his hand. While the deceased was not free from blame, yet it is a fair deduction from the evidence that his life was taken unnecessarily. He had been drinking, and appellant aroused his anger by making insulting remarks about his wife. In his scuffle with Tommy Greer, it was demonstrated that Greer was easily his physical superior, and it is clear from the record that the extreme method resorted to by appellant was wholly unnecessary under the circumstances. There was ample evidence to take the case to the jury and to sustain its verdict.

The judgment is affirmed.